UNITED TUNNEL IMPROVEMENT CO. v. INTERBOROUGH RAPID
TRANSIT CO. et al.

(Circuit Court of Appeals, Second Circuit.   June 14, 1913.)

No. 258.

PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—TUNNEL CONSTRUCTION.
    The Reno patents, No. 723,307 and No. 754,807, for tunnel structures and process of making same by removing segments from the bottom of the iron or steel shell after it is in place and constructing a reinforced concrete girder beneath, to which the shell is anchored, construed, and *held* not infringed.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the United Tunnel Improvement Company against the Interborough Rapid Transit Company and the Rapid Transit Subway Construction Company. Decree for defendants, and complainant appeals. Affirmed.

Following are the statement and opinion of Hand, District Judge, in the court below:

This is a suit in equity upon two patents each issued to Jesse W. Reno, the first granted on March 24, 1903, numbered 723,307, and the second granted on March 15, 1904, and numbered 754,807. The complainant is a company organized by Reno for the purpose of holding these patents. Except in so far as the defendant has used them, the patent has never gone into practical operation anywhere nor has the patentee or the complainant ever issued any license upon the patents, which therefore are what are colloquially known as "paper patents." Each patent consists of structure and process claims for tunnels, built in uncertain foundations. The patentee recites in the first invention that his object is to construct tunnels in easily compressible earth by the use of the well-known segmental iron tunnel shell. He presupposes that the tunnel is to be made by the use of the Brunel shield which is driven forward at the end of the tunnel having an open face from which the earth is excavated. In order to keep the earth and water from entering the open face of the tunnel, a bulkhead is placed at a convenient distance to the rear in that part of the tunnel shell already made and air pressure is maintained between the bulkhead and the open face sufficient to overcome the combined head of water and earth upon the open face. All this the patentee presupposes, and in addition that the foundation of the earth about the tunnel shell was comparatively soft and yielding and that the tunnel would be large enough to take the standard cars and locomotives where the speed is to be very high. Under these conditions "the thin shell of the ordinary tunnel construction is not rigid enough to withstand the enormous concentrated weights

·For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
    207 F.—36

moving rapidly over them. Moreover the vibrations caused by the rapidly moving trains set up a motion in the particles of earth which immediately surround the walls of the tunnel, causing an unstable support for the walls and resulting in cracks and leaks in the tunnel. In my invention I provide a concrete girder of sufficient mass to take up these vibrations before they reach the surrounding earth and of sufficient strength to distribute the load over a large area." His method is to take up the plates on the bottom of the already constructed tunnel between the bulkhead and the shield and to excavate the bottom, to drive longitudinal wooden sheeting in a trench below the tube, to fill the trench with concrete, to lay at the bottom of it steel rods embedded in the concrete, and then to anchor the edges of the shell into the concrete by substantial iron anchors. There is a dispute in the testimony as to whether an alternative form is indicated under which the plates may be replaced over the top of the concrete and the concrete in turn filled up to the level of the ties on the top of the replaced plates. The patentee, speaking of the concrete girder so formed, says: "The concrete girder thus formed and anchored to the cast-iron shell above it will act with the shell as a single member or beam." Also he says that the girder will add to the weight of the tunnel and therefore counteract its buoyancy. The claims in suit are six in number, three for the structure and three for the process. They are Nos. 5, 6, 9, 11, 13, and 15 and read as follows:

"(5) In a tunnel structure, the combination with a cylindrical shell having the shape of a horseshoe arch in cross section of a continuous girder of concrete securely anchored to the springers of said arch.

"(6) In a tunnel structure, the combination with a cylindrical shell of an exterior concrete re-enforcement extending longitudinally beneath said shell and rigidly secured thereto; said concrete re-enforcement having embedded within it longitudinal tension rods."

"(9) In a tunnel construction, the combination of iron segments bolted together in the form of a horseshoe arch; a longitudinal concrete girder joining the end segments of said arch and anchor bolts, securing said end segments to said concrete girder."

"(11) The herein described method of constructing a re-enforced tunnel which consists in driving a segmental tunnel through silt, sand, or easily compressible earth, removing one or more of the lower segments of said segmental tunnel, excavating a trench there beneath and filling said trench with concrete."

"(13) The herein described method of constructing tunnels in easily compressible earth, consisting in first building a tunnel proper of segmental rings then removing certain segments in the floor of said tunnel between the heading and the bulkhead, and then building under the floor a massive concrete girder."

"(15) The herein described process for constructing a re-enforced tunnel consisting in forcing in advance of a bulkhead, maintaining air under pressure between the cutting shield and the bulkhead, excavating material cut by said shield, lining the cut made by the shield with segments adapted to resist the collapsing external pressure, excavating a trench beneath the working chamber, and constructing therein a concrete girder."

The second patent is for a method of building tunnels and proceeds on precisely the same presuppositions as the first.

The girder in question is built in a somewhat different way and is supported upon piles driven into the earth. This may be constructed either by having an iron shell anchored into the concrete girder or by replacing plates, with an opening through which the concrete is poured, making a firm grip around the ribs of the plates. The concrete girder is itself made in the same way except that it is made up of tongued and grooved blocks and that I-beams take the place of rods. When the tunnel base is opened, piles are driven down into the earth, a row of four for each plate, and upon the tops of these the concrete girder is built. The details of driving the piles and removing the plates are disclosed in the patent but are not material to this suit. Four of the 14 claims are here in suit, all of them method claims, Nos. 6, 7, 8, and 12, as follows:

"(6) The method of tunnel construction consisting in forming a segmental tunnel shell, removing floor segments in the base of said tunnel shell, driving piles from within the tunnel through the openings formed, and securing the tops of said piles to said tunnel shell.

"(7) The herein described method of constructing tunnels which consists in forming a segmental tunnel shell, removing floor segments, driving straight piles through the openings made by the removal of said floor segments from within the tunnel, forming a concrete bed upon the tops of said piles, and securing said bed to the tunnel shell.

"(8) The herein described method of constructing tunnels, which consists in forming a segmental tunnel shell, removing floor segments, driving piles through the openings thus formed, forming a load distributing member upon the tops of said piles, and securing said load distributing members to said tunnel shell."

"(12) The herein described method of constructing tunnels, which consists in forming a segmental tunnel shell, removing segments from the floor of said shell, excavating a trench from beneath, forcing piles down through the openings formed in the bottom of the tunnel shell, filling said trench with concrete, and securing said concrete to said tunnel shell."

The defendant operates a tunnel across the East river from the borough of Manhattan to the borough of Brooklyn, which consists of two iron tubes driven by the familiar Brunel method presupposed in the patent in suit. After the tunnel was substantially completed, the defendants found that it was not all in grade. This was due in part to the sinking of the shield in its progress owing to the insufficient air pressure which let in mud and water, in part to the sinking of the completed shell owing to the settling around it of the earth through which it ran. To restore the grade various experiments were tried, among others those to which the complainant objects. In both tubes on the Brooklyn side to about the water level from a point east was made what is known as the "concrete invert," of which there was built 88 feet in the north tube and 172 feet in the south. All this except 16 feet in the south was built at atmospheric pressure. To do this the engineers removed the lower plate of the tube and substituted a concrete base, so that of the original circumference of the tube the cylinder covered about two-thirds and the remaining one-third was covered by the concrete. The details of the structure can be so much more readily comprehended by the diagrams than by words that it is best for an understanding of them to refer to the complainant's exhibit, "Drawing of Sub-base Construction Arched Metal Shell," and to the complainant's exhibit, "Drawing No. 5." It may be well here to say, however, that the "invert" contained no longitudinal rods but did contain transverse rods. Whether it was anchored to the shell above is in dispute between the parties and is considered in the opinion.

The other part of the structure which the complainant thinks infringes the first patent was built below the water level and for a distance of 108 feet, and in the north tube considerably nearer the Brooklyn than the Manhattan shore, and like the "concrete invert" can best be understood by reference to the drawings which are exhibits in the case, complainant's Exhibit 22.

The alleged infringement of the second patent arises from the fact that after the tunnel was built the defendant, fearing for its safety while the superincumbent earth was settling around the sides of the shell, opened the bottom and drove down iron piles, two abreast, which they then filled with concrete. The tops of these they anchored in cradles of concrete upon which the tube rested. The cradles were 25 feet and 51 feet apart and had no connection between them. They were fastened to the plates when replaced only by forcing grout through the grout holes left in the plates.

These patents can best be considered separately. I will consider first patent 723,307, next patent 754,807.

## Patent 723,307.

There are three structure claims in suit and three method claims. I shall assume with the complainant that claims 5 and 9 indicate a tunnel in which the bottom plates have been permanently removed, while claim 6 indicates

one in which they have been replaced, so that figure 1 of the patent reads upon it: Is the "concrete invert" an infringement of claims 5 and 9? Is the "sub-base construction" an infringement of claim 6? Was the reconstruction of the tunnel at either or both parts in which they occur an infringement of claims 11, 13, and 15?

The "concrete invert" is a tunnel structure having a cylindrical shell. The question is whether it has a continuous girder securely anchored to the springers of the arch. That the girder is not continuous in the sense which the disclosure indicates is too obvious for comment, because it has no binding rods which can give it any reinforced longitudinal tensile strength. It must depend wholly upon the inherent tensile strength of concrete, and that too of concrete which was laid in blocks at intervals. However, it may still be regarded as a girder. Again, if "anchored" at all, the girder is anchored only because of the pressure on top of the horseshoe arch which keeps the shoes in engagement with the lugs of the transverse bars and thus takes up the sheering strain between the iron shell and the "concrete invert." If so, the whole acts as one girder; the concrete being in tensile strain, the tube in compression.

I do not mean to consider whether this is an equivalent to "securely anchoring" the girder to the arch, because I am so clearly satisfied that the concrete is not a "continuous girder" in any such sense as the patentee intended. A girder is a member put in to take up a strain between two supports, and it is perfectly obvious that this invert was put in for no such purpose at all. The foundation was entirely adequate over the whole surface where it was used, nor is there the slightest reason to suppose, if the tunnel had not been deformed in the making, that any foundation at all would have been necessary. Furthermore, whatever the theoretic tensile strength of concrete, it is very doubtful whether practical men would rely upon it for that purpose, under the conditions in which it must be laid. Noble, for instance, the complainant's witness, says that it cannot be depended on and that it has no factor of safety. If one could be sure that no holes would not exist to which the cement has not reached, and if laboratory conditions could be secured, the case might be different, but obviously they cannot. Therefore I should hold, if it were necessary, that even a monolithic base of concrete, if made a foot thick, under the conditions in question, was not sufficiently shrown to have any such tensile strength as would or could practically be thought to act as a girder. As I shall show later, the defendants certainly had no intention of the sort and Freeman's assumption that they did not reinforce it longitudinally, though they did transversely because they thought it already strong enough, cannot be taken seriously for a moment.

However, this is all on the assumption that the "invert" is a monolith, which it is not. It is laid in lengths of on the average 13 feet and each length when laid was flanked by a board against the surface of which the concrete was poured. The average time between the completion of one section and the beginning of another was seven or eight days. When the new section was commenced, the concrete was poured against the old surface without any effort to bind the two together. Now the bond between new and old concrete, the defendant's witnesses say with much detail, is quite different from the cohesion of a concrete monolith. Reno left his girder to depend upon nothing of the sort but in both patents inserted tensile steel or iron to bind the whole together. To meet the defendant's case the complainant presents practically nothing. Reno himself, it is true, says that the adhesion is nearly as great as cohesion, but his witness Freeman does not support him as I shall show, while Noble will not even give any practical value to monolithic concrete in tensile strains. Freeman, when first questioned (XQ. 47), had an impression that he had seen somewhere that the adhesive strength was 90 per cent. of the cohesion. This certainly is negligible. Later and in rebuttal (folios 1007–1010) he assumed that the concrete was put on in horizontal or inclined surfaces so as to have a bond, an assumption subsequently contradicted by the testimony. He further says that, even if this were not so, the whole would be a "very stiff structure." On cross-examination (XQ. 7 and 8) he declines to say more at first than that the bond would

be less than the cohesion of a monolith. Finally on redirect, in answer to a question presupposing no bond, he explains the load distributing effect of separate sections if the impact was on one end only.

From all this it abundantly appears that the adhesion between the old and the new concrete does not in any sense make a continuous and massive girder, such as Reno had in mind. One cannot with any justice compare the succession of short section each less than a fourth of a car length with the structure which Reno had in mind and which was to distribute the impact of a heavy locomotive over a substantial area. Indeed, as I read the testimony, the final position is that the term "girder" will include a series of successive blocks, none of which performs any girder function, but each one of which by its resistance to compression will transmit some of the strain to the others when the impact is at its end. When the weight is at the middle of any block nothing will support it but the friction at its edges. Reno's girder has become a split lintel operating wholly by compression.

Again, consider that the defendant expected strains laterally and provided against them by the rods to take up tensile strains, while no rods were used longitudinally. Certainly the defendant could not have intended the base to take up as much strain longitudinally as it must transversely, or it would have reinforced the concrete in that way too. Therefore it is quite obvious that the defendant never intended that substance to act as a girder longitudinally at all, since it was not able to do so transversely, unless the strains were very different. They were in fact different, because, owing to the excellent foundation, there was no longitudinal strain, no shock to be distributed. If the defendant built a girder, it certainly did so unwittingly. The words of the patent must be interpreted reasonably and with a sense of their context. By a girder the patentee of course meant something capable of distributing the impact of a locomotive. The only distribution which would help would extend over an area much longer than the locomotive. A member having an inherent girder action which would effect such a distribution of shock was all he meant and all he could have meant. The "concrete invert" does nothing of the sort, because it acts as a girder only in sections much shorter than any single car which will pass over it. Even the whole of the whole section of 177 feet is shorter than a train. It is quite clear to me that these fragments are not in any sense within claim 5.

Claim 9, being more specific than claim 5, necessarily falls with it.

The next question is of the 108 feet of sub-base construction below the water line in the north tube. This structure is in my judgment a form of girder; at least it would be such if rigidly annexed to the shell of the tube. I agree that if detached it is more doubtful, because the iron reinforcement is substantially in the neutral plane of stress and would have no tensile value, yet even in that position it would act as a girder of a depth from below the rods to the top of the concrete, disregarding the tensile strength of the concrete below the rods altogether. It is not therefore because it has no capacity as a girder that I disregard it but because it is not "rigidly secured" to the cylindrical shell. I need not go into the theory of the cohesion between iron and concrete, because there is actual evidence from plates subsequently taken up to show that there was no such attachment between the concrete and the base of the tube as justifies the term "rigidly secured." The concrete when laid was kept an inch or more below the replaced plates and, when the grout was squirted in through the grout holes, it attached the two together, so far as we can now find out, over not more than half the surface. Indeed, the plates detached themselves from the concrete when they were pulled at one end. Mud and water had in part filled in the space between the concrete and the plate over a large part of the area.

Now it does not appear just what Reno meant by the rigid securing of the girder to the tunnel, in case the plates are replaced. He does not in his specifications refer to any such structure and I am giving his patent that scope, because figure 1 seems to show it. Whether the replaced plate was to have apertures in it as the case in the second patent or not, I cannot say, probably not. If not, then the rigid attachment must be that understood by one skilled in the art and such a one could have understood nothing but the very

common use of grout for the purpose. For the sake of argument therefore, and in view of the fact that no means of attachment is anywhere shown. I shall assume the attachment intended was that between metal and concrete or grouting. Even in that case the patent could not mean such an attachment as was in fact effected by the defendant, made without any effort to keep the mud and water out, and resulting in what cannot under the circumstances be regarded as a rigid securing in the sense that the tube and girder form one member for engineering purposes.

Moreover, if this be not true and if the defendant's attachment be regarded as rigid within the patent, the complainant at once falls foul of Breuchard, No. 706,380. There the structure disclosed was a heavy concrete girder laid below a complete shell and re-enforced with longitudinal iron beams to take up tensile strains. It is quite true that Breuchard shows no rigid attachment, but then, I have shown, Reno shows none either. The only rigid attachment actually disclosed was when the bottom plates are removed, and, when they are replaced, a person following the patent would have only his knowledge of the art to guide him. If that would lead him to use grouting in the case of Reno's patent, it would lead him to use it in the case of Breuchard. Therefore Reno's patentability over Breuchard in respect of this structure must rest only upon the fact that Reno said that the girder must be rigidly secured without showing any means, while Breuchard did not. Now such a suggestion might be patentable in some cases, but it is absurd to regard it so in the case of a tunnel of this character in which it had been customary for many years to surround the whole shell with grouting anyway. For example, the defendant has done this to the whole of both its tubes, and Reno's own disclosure shows it (figure 1, No. 5) apparently as a usual method of construction. There was therefore nothing novel in suggesting that the concrete girder be attached when grouting was to be the attachment.

Coming now to the method claims, I can see no substantial difference between 11 and 13, unless it be that claim 11 covers any opening within the tunnel, while claim 13 covers only an opening between bulkhead and heading, and there must be a girder to satisfy claim 13. After Breuchard, 706,380, and Stone, 748,809, there can be said to be nothing new in building beneath the shell of such tunnels a massive concrete girder or digging a trench and filling it with concrete. It is true that Breuchard does this in advance, just as he drives his piles in the same place, but Stone did not, for his manhole with his cover "1" was situated back of the end of the shield. Now I really cannot see how the difference is patentable. Breuchard depended upon the rigidity of his shield to hold back the earth until he laid his foundation at the bottom, and he left an opening at the bottom for just that purpose. Stone did precisely the same thing, though his manhole was further to the rear, a difference which to me seems absolutely immaterial. It is true that each of them had a substantially solid front between the opening and the bulkhead in the rear, and this was indeed a very good thing, because it would prevent the difference in pressure between the top and bottom of the shield, which was dangerous beyond any doubt, if the bottom was to be left open. The chance of blowouts where the whole front of the shield is open is greatly increased, and in excavating with either Stone's or Breuchard's method the air pressure could safely be kept much higher than with the complainant's. I do not forget that Breuchard had openings in the front of his shield through which some air might escape, but that is a very different matter from having the whole of the face quite open, because the openings were small and would allow the escape of much less air. The defendant's reconstruction between two solid bulkheads, therefore, much more nearly approximates these than it does the patentee's.

The complainant must therefore depend for patentability over these two disclosures upon the fact that he has built his tube and then opened it afterwards. This his counsel describe quite warmly as a very bold conception never before ventured in the history of the art, but surely it was no more temerous to take out the bottom of one or more of the segments already laid than it was to keep the bottom of the shield itself open. Indeed, it seems to me to be a clumsier way of accomplishing the same result than Breuchard or

Stone. Nor, indeed, was there anything bold at all about leaving open the bottom of the tunnel when you had command of compressed air. The only boldness which was involved was that of the complainant in suggesting that the bottom be opened while the whole heading remained under pressure from water and earth; and that, while perhaps it may be feasible, at least has never been done and is in the opinion of competent experts an extremely hazardous operation. If the ends be solid, so that there is no great difference of pressure, the mere opening of the base, which was all that the defendant did at any time, was a thing known in the art before either Breuchard or Stone. Vide Edwards, British Patent, 1883, 3864. If the patent in suit had proved itself in any given instance to be practically a great advance over the disclosures which I have been discussing, I should yield my merely personal conviction to the history of the industry, but, except in so far as this supposed infringement be an instance, none has ever used Mr. Reno's method for any purpose, and with the best will in the world not to substitute for the invention the mere opinion of a judge I cannot bring myself to think that there is anything more than a very obvious difference in method between building a concrete girder for a foundation from below a hole made in the shell and building it below any opening in the shield itself.

In respect to the fifteenth claim the same considerations apply, except that no strain of the words here seem to me to permit the construction which would result in an infringement in this case. The claim is so specific that the air pressure should be between the cutting shield and the bulkhead as to eliminate either concrete invert or sub-base. Indeed, in the case of the concrete invert the infringement is met for two reasons, both because the whole of the reconstruction was long after the cutting shield had been removed and because it was nearly all done at atmospheric pressures. Certainly if the complainant cannot recover under the eleventh claim he cannot hope to recover under the fifteenth claim. I think he can recover under neither one of the two.

Throughout his testimony the complainant speaks as though he had conferred a great benefit on the defendant and alone made possible the reconstruction of its tunnels. This seems to me to be a quite unfounded position, for the testimony is absolutely uncontradicted that the foundation for the tunnel was absolutely safe everywhere; Noble joins in this conclusion with the rest. Reno meant his structures to answer difficulties, which did not exist here, and it is really absurd to speak of these tunnels as being made possible by what he disclosed. I cannot indeed see how any one can even cursorily look at the supposed infringements to the first patent and think that they are essential. Instead of being of any assistance for the reconstruction of the tunnels, I think that it is nothing short of the exact truth to say that he helped them not a bit and that no fair-minded person observing the wholly fragmentary and experimental character of the supposed infringement could come to this conclusion. These considerations, it is true, are not strictly relevant to the question as to whether there has been infringement or not, but they are nevertheless an answer to what I cannot but feel is an unfair suggestion by the complainant that the defendant is trying to appropriate his invention without any return. The concrete invert proved to be a most extravagant method, wholly impracticable as soon as those conditions were encountered which the complainant presupposed in his patent. As for the sub-base construction, it is proved quite unnecessary, for the defendant reconstructed its tunnel except for that 108 feet without any sub-base anywhere.

The bill is dismissed as to the first patent.

### Patent 754,807.

This patent is quite easily disposed of in view of Breuchard, if the considerations be valid which I have already stated. Breuchard shows piles driven from the fore part of the shield. He shows a concrete bed upon top of them, continuous in character and knitted together by iron I-beams. I cannot understand the distinction which the defendant's expert witness attempts to draw between this patent and the patent in suit. He seems to suppose that a comparison between the claims is material, but surely it is not necessary to

say that it is not the claims but the disclosure which anticipates. I do not say that Breuchard anticipates all the claims in such sense as to make the whole patent invalid, because the method shown by Reno for securing the girder and piles to the tunnel shell is quite different from that disclosed by Breuchard, since, the bottom plates of the tunnel being left open, there will be grillage embodied in the concrete which will effectively anchor the whole shell to the girder even more strongly than is shown in figure 4 of patent 723,307. This idea is probably indicated in the last words, "securing the tops of said piles to said tunnel shell," with which claims 6, 7, 8, and 12 all conclude. The structure so indicated would be in every sense a single member of great girder-like capacity and may prove of utmost value for certain purposes, but it is not the defendant's structure. The only "securing of the tops of the piles to the tunnel shell" was by squirting grout between the shell and the cradle, and that proved, as I have already said, to constitute a very tenuous attachment. If the patent is to depend merely upon securing Breuchard to the shell by grout, the patent is not novel.

Nor was Breuchard alone the only person to drive piles through a tunnel of this sort. There was no difficulty in opening the bottom of the tunnel under the pressure accessible; nor was there any difficulty in driving down piles or piers. This had been indicated and done in tunnels of this character by several others before this; thus, Jacobs, 690,960, and Lindenthal, 714,204 and 714,205. I do not mean that any one of the inventions was an anticipation of the patent in suit, but I do mean it showed that there was no difficulty in driving piles through an opening made in the base of such a tunnel. Such patents taken in connection with the first patent in suit, itself a part of the prior art, leave the second patent too limited in scope to cover the defendant's method.

It is very significant, as I think, that, at about the time that the tunnels were built under the East and North rivers in this city, a whole group of patents for tunnels came out and that there was nothing radical achieved by any one of the patentees, but each elaborated ideas of somewhat similar character to meet the supposed difficulties which would be encountered in the soft material supposed to exist, especially under the North river. This was to be done either by a pile or pier foundation, or a concrete foundation, or a combination of both, and the number of these patents at that time seems to me pretty fairly to indicate that there was nothing of invention in the general ideas but only in the details in which they were worked out. I have already alluded to one such detail in the case of the present patent which may be patentable, but the mere use of piles with separate cradles of concrete on which the tube is to rest was not a patentable idea. In this view I need not consider whether cradles at intervals of 25 feet or 51 feet could from any point of view infringe the claims. The bill will be dismissed also as to the second patent.

I have hitherto assumed in this discussion that both Breuchard and Stone anticipated the defendant's patent. There is no dispute in respect of the second patent in suit. In respect of the first, the complainant does not concede it. The application in that case was filed on December 24, 1902, and the application of Breuchard was filed February 24, 1902, and of Stone on February 12, 1902. Stone's patent by stipulation has been antedated to the summer or autumn of 1901, and in rebuttal of this the plaintiff attempts to antedate his own invention to October or November in 1900, over two years prior to his application. In proof of this his wife testifies to a conversation she had with her husband on the date in question in which he showed her two sketches exhibiting the section of a completed cylindrical shell with a concrete girder beneath it and re-enforcing rods at the base embedded in the concrete. In the consideration of this question I shall assume the truth of the conversation as testified to by Mr. and Mrs. Reno. Reno, however, gives no explanation of the delay except that he was studying a good deal on the question and was looking up in text-books as to the strength of concrete girders and was reading everything that he could find on the subject.

The law in respect of this subject is laid down after a full examination of the authorities by Judge Colt in Automatic Weighing Machine Co. v. Pneu-

matic Scale Co., 166 Fed. 288, and it may be accepted, especially in view of the great authority in patent law of the learned judge who delivered the opinion of the court. It is this: An invention may be carried back to the date of its full conception by the inventor, provided he has used due diligence in reducing to practice or in making application, if there be no reduction to practice, as in the case at bar there could be none. In that case an unexplained delay of one year in reduction to practice was held too long. Judge Lanning for the Third Circuit Court of Appeals announced the same rule in Continental Rubber Works v. Single Tube A. & B. T. Co., 178 Fed. 452, though the delay was there excused. Judge Kohlsaat applied it in Curtain Supply Co. v. National Lock Washer Co., 174 Fed. 45, where the delay had been six years. The earlier cases may all be found in Judge Colt's opinion.

Now Reno is in this dilemma; if his disclosure was complete in October, 1900, he was not reasonably diligent in waiting until the end of December, 1902, to file his application; if he was reasonably diligent it was because he needed for the completion of his conception the intervening two years, and he does not antedate Stone and Brenchard. I cannot see any escape from one horn or the other. He himself suggests no reason for the delay, but the necessity of engineering study, and that did not interfere with an application if he had really fully conceived the invention. It was necessary only in case he was not yet satisfied that he had actually grasped and solved the full problem, and that means that he regarded his ideas yet as tentative and provisional. If they were such, they were not the conscious answer to the problem, for which the inventor will hold himself responsible, that the law requires, but he had only pregnant suggestions still offered as hypothetical solutions, thrown out provisionally as the basis for investigation and confirmation. He makes no claim that poverty or sickness stood in his way, nor that he was too engrossed with independent affairs, assuming that such would be any excuse. For these reasons his date of invention must be in my judgment that of his application.

Bill dismissed, with costs.

This cause comes here from an appeal from a final decree of the United States District Court, Southern District of New York, dismissing a bill in equity for infringement of two patents. They were both issued to Jesse W. Reno; the first, No. 723,307, March 24, 1903, for "tunnel construction"; the second, No. 754,807, March 15, 1904, for "pile foundation."

Prindle & Wright, of New York City (Edwin J. Prindle and Arthur Wright, both of New York City, of counsel), for appellant.

J. L. Quackenbush, of New York City (J. E. Bull and Chas. T. Adams, both of New York City, of counsel), for appellees.

Before LACOMBE, COXE, and WARD, Circuit Judges.

PER CURIAM. In the opinion of the District Judge will be found a full statement of the specifications and an enumeration of the claims relied upon; repetition of them is unnecessary. We fully concur with Judge Hand in the reasoning by which he reached the conclusion that defendants have not infringed the patents as he has construed them and would not find it necessary to add anything were it not for the circumstance that he has given to the senior patent a broader construction than we think it is entitled to.

Whatever may have been in Reno's mind and whatever he may have said in some contemporaneous document, we find it impossible to persuade ourselves, with all the help that his counsel's brief affords, that his patent discloses a structure in which the segments of the shell

rings, which are removed for the purpose of building the concrete girder, which is to underrun the entire length of the tunnel, are to be replaced after the girder is built. Possibly it may be held to indicate that: If we number the successive shell rings 1, 2, 3, 4, 5, 6, 7, 8, etc., 1, 3, 5, 7, etc., have their lower segments removed, their place being taken by the concrete girder, while 2, 4, 6, 8, etc., remain undisturbed. But that seems a very strained construction and we should doubt whether such a tunnel would be practicable in operation; certainly none such has ever been built so far as this record shows. We find nothing in the patent to warrant the conclusion that the tunnel, when completed, consists of a shell, wholly of iron or steel, which rests on a concrete base. On the contrary, the patentee at lines 96 etc., p. 2, states that the concrete which forms the girder "replaces those segments" which were removed to build it; and again at line 98, etc., p. 1, he says that the rings, when bolted together on their sides, form (not the whole shell) but "the *main part* of the shell of the tunnel."

The only support for the contention that the removed segments of the tunnel rings are to be replaced after the concrete girder sets is said to be in the drawings. Judge Hand thought that such a structure was shown in figure 1, but we do not so understand it. Turning to the drawings, there are shown at the bottom of Fig. 1 segmental plates (the three lower plates, one 13, a very short one) of a ring, but they are no part of the ring nearest to the spectator; they belong to the ring next beyond, showing plates, which have not yet been removed. This is manifest from the specifications, which state that Fig. 1 represents a cross-section on the line *a-a* of Fig. 3. On that line *a-a,* the bottom segment (13) of the ring that line intersects has been removed, so that the segment 13 shown in Fig. 1 must belong to some other ring.

Fig. 2 does not show that restored segmental plates 13 and 14 have been removed and all it indicates is the method of building up the concrete; it indicates nothing as to what the tunnel will be when completed. This figure also indicates a cross-section on the line *a-a.*

All that there is to base the contention on is the single heavy line in Fig. 3 at the lower end of the longitudinal section of the left-hand ring. We know of no authority which will warrant a court, from so small a portion of a patent drawing, to insert into the claims a material element, not suggested or described anywhere in the specifications or claims. In addition to the passages already quoted from the specifications, the following excerpt will indicate how carefully the patentee avoided expressing the idea of replacing removed segmental

plates, which it is now contended he had in mind and intended to cover by his patent:

"When the shield has been advanced a sufficient distance from the bulkhead, about fifty (50) feet, one or two of the narrow segments 13 and the adjacent segments 14 are removed, as shown in Figs. 3 and 5, and the earth beneath the tunnel is removed to form a trench for the concrete girder. This trench is preferably excavated in three separate sections, as indicated in Fig. 2. First, the outer sections are formed by driving the wooden sheeting (indicated by numerals 9 and 10 in Figs. 1 and 2) forward for a length sufficient to allow the placing of a length of tension rods 7. The two side trenches are then filled with concrete in the same manner, the drainpipe 8 being formed by packing the concrete around suitable wooden moulds, as is well understood. After the three sections of the trench have been filled with concrete up to the circular rings, forming the shell of the tunnel, the lower segments 13 and 14 are removed from the alternative rings, the anchor bolts 15 are inserted in position, and the concrete is built up to the required level to support the track stringers or cross-ties for the rails. After the concrete has set the remaining lower segments may be removed and the spaces which will be occupied with concrete as before.

"By removing at one time only the alternative segments and allowing the concrete which replaces those segments to set before the remaining segments are removed all tendency of the shell to collapse by reason of their removal is avoided."

On all other branches of the cause we fully concur with Judge Hand.

Decree affirmed, with costs.